**Robert G. VENN, Plaintiff**

v.

**TENNESSEAN NEWSPAPERS, INC.,**
Defendant.

**Civ. No. 2469.**

United States District Court
M. D. Tennessee,
Nashville Division.

Jan. 5, 1962.

Supplemental Memorandum Jan. 8, 1962.

Caruthers Ewing, Memphis, Tenn., and J. Vaulx Crockett of Stockell, Rutherford & Crockett, Nashville, Tenn., for plaintiff.

Cecil Sims and Frank C. Gorrell, of Bass, Berry & Sims, Nashville, Tenn., for defendant.

**WILLIAM E. MILLER, Chief Judge.**

This action was brought by plaintiff, a citizen and resident of Miami, Florida, to recover compensatory and punitive damages on account of the publication by defendant, a Tennessee corporation, of certain allegedly libelous newspaper articles.

Jurisdictional prerequisites are satisfied by the diversity of citizenship of the parties and the requisite jurisdictional amount. 28 U.S.C.A. § 1332.

By agreement of the parties the case was tried to the Court without a jury.

At the time of the publication of the articles upon which the suit is predicated, and for a number of years prior thereto, plaintiff Robert G. Venn was engaged in advertising and publicity promotion, principally in radio and television fields. He had occupied positions of responsibility and authority in both radio and television and had acquired a reputation for competency, experience, responsibility and integrity in radio and television advertising and promotion, and also in the field of management. The defendant is, and was at all times material herein, owner and publisher of the "Nashville Tennessean", a metropolitan daily newspaper with extensive circulation throughout Middle Tennessee and with additional circulation in other states and in foreign countries.

Among his other activities, plaintiff had originated, developed and produced a type of television program which had become known to the public as the "Talkathon", a program on which a political candidate would appear for prolonged periods of time without interruption to receive and answer questions submitted by the public viewers. In the summer of 1954, the defendant, through the Nashville Tennessean, vigorously supported Senator Estes Kefauver in a contest with Congressman Pat Sutton for the Democratic nomination for United States Senator from Tennessee. During the campaign the plaintiff Venn was engaged to conduct several television "talkathons" for Congressman Sutton.

After general averments of the historical background, the complaint alleges that the defendant, " * * * as a means of electing its candidate, wilfully set out in its newspaper to destroy, throughout Tennessee, plaintiff's business and professional reputation and standing, also his personal reputation, standing and character, and also the good will, value and standing of the Talkathon, well knowing that plaintiff would tend to be similarly damaged throughout the nation. Accordingly, at or about the time of the Memphis Talkathon it commenced a planned and deliberate attack on plaintiff through its newspaper." The complaint then sets out eight counts, declaring respectively upon publications in the Nashville Tennessean in its issues of July 3, 15, 16, 17 and 30, and August 2, 3 and 6, 1954.

It is the theory of the plaintiff that the publications were false, defamatory, and libelous per se; that they were made without probable cause and with actual malice; that they were made with reckless disregard of the true facts and of the injury which would naturally and necessarily result to plaintiff and his business; and that the publications were not privileged. On the other hand, defendant insists that the publications were not subject to the construction attributed to them by the plaintiff and were not libelous per se; that the publications, when

properly interpreted, and when considered in context, were true; that the publications were privileged; that the action is barred by the Tennessee statute of limitations; and that plaintiff failed to comply with the requirements of Sec. 23–2605, Tennessee Code Annotated, in that he failed to serve legal notice on defendant prior to instituting suit.

While there are numerous questions of law and fact involved, the primary and crucial issue in the case is whether the publications, when properly construed, are libelous, and if so, whether they are actionable per se or per quod. At the outset, therefore, the several publications must be considered at some length and their true meanings determined in accordance with certain established and recognized rules of construction.

It is elementary that a publication claimed to be defamatory must be read and construed in the sense in which its readers would ordinarily understand it. Black v. Nashville Banner Publishing Co., 24 Tenn.App. 137, 144, 141 S.W.2d 908. Another basic principle of significance in the present case is that the determination of whether an article is libelous per se must be made from the four corners of the article itself without reference to other publications and without reference to extraneous facts. 33 Am.Jur., Libel and Slander, Secs. 84 and 87.

The proposition is also well established that a direct assertion is not required to constitute a libel, for the libelous meaning may be expressed by signs, suggestions, inferences, or by implication—oftentimes more effectively than by a direct statement or assertion. 33 Am.Jur., Libel and Slander, Sec. 9, P. 43.

It is the plaintiff's insistence that the several publications here involved when read and considered with these principles in mind necessarily conveyed the meaning, first, that the plaintiff Venn at the time he was in Tennessee conducting the talkathon and prior thereto, was an associate both in business and social circles of criminals, gangsters, mobsters, and other elements of the underworld, and second, that plaintiff Venn, in conducting the talkathon in the Sutton campaign against Kefauver, was a "tie-in" or connection between Sutton and such criminal elements, the latter supporting Sutton because of a desire for revenge on account of exposures by Kefauver in connection with the Senate Crime Committee investigations. The defendant on the other hand denies that the publications are subject to the meanings and imputations attributed to them by the plaintiff and says that when they are read in their entirety no meaning is conveyed or could reasonably be conveyed to the average newspaper reader that the plaintiff was or had been an associate of gangsters or criminals or a "tie-in" or connection with criminal elements in conducting the talkathon in the Kefauver-Sutton campaign. The first question, therefore, to be disposed of is the meaning of the several publications.

After careful analysis and consideration of the eight publications declared on, the Court is compelled to the conclusion that the publications of July 15 and 17, 1954 are libelous per se. The remaining six articles dated respectively July 3, 16 and 30 and August 2, 3 and 6, 1954 are so ambiguous and uncertain in meaning insofar as the plaintiff is concerned that it must be held that they are not libelous per se and that an innuendo must be pleaded and proved to establish a defamatory imputation with respect to the plaintiff. 53 C.J.S. Libel and Slander § 162(2). In addition, before such articles could be actionable it would be necessary for the plaintiff to plead and prove special damages resulting from such publications. Railroad v. Delaney, 102 Tenn. 289, 295, 52 S.W. 151, 45 A.L.R. 600; Fry v. McCord Bros., 95 Tenn. 678, 689, 33 S.W. 568; Bank v. Bowdre Bros., 92 Tenn. 723, 734, 23 S.W. 131. As will be pointed out hereinafter, the plaintiff has failed to prove special damages, with the result that his right of recovery on the six publications not libelous per se must be denied without consideration of wheth-

er such publications can be shown by proof to have a defamatory meaning as to the plaintiff.

 The articles considered by the Court to be uncertain and ambiguous in meaning have one central and overriding theme, i. e., that the gangster and underworld elements which had been exposed by Kefauver as a result of the investigations of the Senate Crime Committee were determined to defeat Kefauver in the primary election by supporting the candidacy of his opponent, Congressman Sutton, and that to accomplish this purpose such gangster and underworld elements were pouring money into the state to promote and support the Sutton campaign. Some of the articles were written by the defendant's own correspondents and reporters covering the campaign, others were written by the defendant's correspondents in other states or localities, some were written by independent columnists, such as Drew Pearson, and other articles were written by other newspapers and carried by the defendant, such as the St. Louis Post Dispatch and the New York Daily News. It would unduly prolong this opinion to recite the many statements of the various articles, most of which are excessively prolix, rambling and discursive, but there can be no doubt that the one point that the articles sought to establish and to impress upon the public was that Sutton was being supported in his efforts to unseat Kefauver by the gangster elements of the country and that his campaign was being fed large amounts of money from the underworld for this purpose. With this central theme the articles make repeated references to the investigations of the underworld made by the Senate Crime Committee and headed by Senator Kefauver, to the fact that Kefauver investigated, among others, the Continental Press Service, a national racing wire service, at one time headed by Arthur B. (Mickey) McBride, to the fact that the Continental Press Service was put out of business as a result of such investigations, to McBride's background and activities, to the FCC hearings concerning radio station permits in which McBride was interested, and to many other subsidiary facts. Insofar as the plaintiff is concerned, while there are a few inaccurate and misleading statements as to his previous activities, for the most part in some of the headlines, the articles correctly set forth that the plaintiff was a former associate in business with McBride in that he managed radio station WMIE in Miami which was in part owned by McBride, and that the plaintiff was taking a leading part in the Sutton campaign, principally as a radio and television expert in conducting the talkathon, a publicity device which had been invented by the plaintiff and which he had promoted and used extensively in other election campaigns in various parts of the country.

Construing the several articles in their entirety and on the basis of the entire language used, it is apparent to the Court that the most favorable view insofar as the plaintiff's case is concerned is that the publications have a dual or ambiguous meaning and, therefore, that it cannot be concluded from the face of the articles themselves that they are libelous. It may be that an average newspaper reader would infer from the articles that the plaintiff Venn was a "link" or "tie-in" between the Sutton campaign and criminal elements in the sense that he was a conscious and knowing tool of the underworld itself in its efforts to defeat Kefauver, and for this reason that the plaintiff was in Tennessee to conduct the talkathon and otherwise to aid and assist the Sutton cause. On the basis of this interpretation, which the plaintiff says is the only reasonable one, the articles would, of course, be defamatory per se and there would be no doubt that they would be actionable as such without further proof or explanation.

But upon carefully reading and analyzing the various articles, it becomes immediately apparent that an average newspaper reader could reasonably conclude that the plaintiff Venn had simply been employed by Sutton to conduct the talkathon, a device which plaintiff had invent-

ed and which he owned, perhaps at the suggestion of McBride because of McBride's knowledge of his experience in this field, and that any support of the talkathon from the underworld or any money supplied to the Sutton campaign by criminal elements was not necessarily with the knowledge of Venn. In other words, an average reader could very plausibly infer that Venn was participating in the Sutton campaign because it was his business to conduct talkathons in election campaigns and that he was conducting the talkathon in this instance as the result of a normal business transaction. In this way, of course, the plaintiff Venn would in a sense be a "link" or "tie-in" between the underworld and the Sutton campaign, yet he would not be a conscious or knowing "link" or "tie-in" and, consequently, he would be free of any blameworthiness or reprehensible conduct insofar as his activities in the campaign were concerned. Therefore, the mere implication in the articles complained of that plaintiff was such a "link" or "tie-in" would not necessarily be defamatory. In this connection, it is to be noted that in the several publications the plaintiff is never referred to as a gangster or as a part of the underworld. On the other hand, he is many times referred to as the inventor of the talkathon, as an expert in the television and radio field, and as a man who had successfully promoted the use of the talkathon as a publicity device in political elections. While McBride is generally depicted in the various articles as an unsavory character and it is stated that Venn was a former associate of McBride, the articles when read in their entirety make it clear that the association was by reason of Venn's having managed a Miami radio station in which McBride owned an interest. This was a correct statement of fact. Yet it does not necessarily follow therefrom, nor would an average newspaper reader necessarily conclude, that Venn, because of such business connection, was a tool of McBride, or that he was a part of the underworld, or that he was in Tennessee participating in the Sutton campaign as a knowing or conscious link with the underworld rather than in his capacity as a legitimate business man selling his services as a television and radio expert.

The publication of July 15, 1954 reads in part:

"KEFAUVER LASHES
SUTTON'S BACKERS

"Says Opponent Gets
Support of Criminals
Oil Rich Texans

"KINGSTON, Tenn.—Sen. Estes Kefauver declared at a rally of Roane County Democrats here last night that his opponent is receiving the support of nationwide criminal elements and oil-rich Texans.

\*　　\*　　\*　　\*　　\*　　\*

"In an hour-long speech, the senator tied in Sutton with nationwide criminal elements this way:

"'You know we all like to be friendly with everybody. But sometimes we are known by the enemies we make. Likewise we are known by the company we keep.'

"Then Kefauver proceeded to describe the company that is now being kept by Sutton.

"*Referring to activities of the senate crime investigation committee, which he headed several years ago, in breaking up the interstate gambling wire services, headed by Mickey McBride, Kefauver said:*

"'*Bob Venn, who was in business with Mickey McBride—the man who headed the largest of these services—and who moved in circles with Al Polizzi, the Cleveland mobster, is in Tennessee right now conducting talkathons in an effort to defeat me.*'

"Associating Sutton with another segment of the nation's underworld, Kefauver briefly reviewed the history of exposing gambler Frank Costello \*　\*　\**" (Emphasis added.)

No extended analysis is required to disclose the clear and unmistakable meaning of this publication. The thrust of the article is that Sutton is receiving the support of nationwide criminal elements

and that the conscious "tie-in" between such criminal elements and Sutton is the plaintiff Venn.

The unequivocal statement is made by defendant that Senator Kefauver in his speech at Kingston had "tied in Sutton with nationwide criminal elements". Then follows a narration or description of how this "tie-in" or connection had been established. The two italicized paragraphs of the July 15th article could only mean that the plaintiff Venn was in business with Mickey McBride in carrying on his interstate gambling wire service broken up by the Senate crime investigation committee (a completely false imputation since the plaintiff had never been connected with McBride in any wire service), and further that the plaintiff Venn "moved in circles with Al Polizzi, the Cleveland mobster." The defendant argues strenuously that the article when properly construed means that Mickey McBride moved in circles with Al Polizzi and not the plaintiff Venn. Even if this argument should be accepted, the publication would still carry the unmistakable imputation that the plaintiff was in business with Mickey McBride in carrying on an interstate gambling wire service, broken up in a senate crime investigation headed by Kefauver, and that because of Kefauver's having exposed and broken up such business, the plaintiff was present in Tennessee in an effort to defeat Kefauver. The plaintiff in this way is clearly portrayed as a part of "nationwide criminal elements" and as the conscious link between them and Sutton.

But, in addition, the Court is convinced that the defendant is mistaken in its construction of the paragraph in question. Although Senator Kefauver in his speech may have intended to imply that Mickey McBride moved in circles with Al Polizzi, the paragraph as written in the defendant's newspaper does not permit this interpretation. By use of the two dashes, the defendant parenthesized and isolated the words "the man who headed the largest of these wire services" in such way as to make them refer to McBride, leaving the remainder of the sentence to refer only to the plaintiff Venn. In this manner the sentence is made to impart precisely the same meaning as if it were composed: "Bob Venn, who was in business with Mickey McBride and who moved in circles with Al Polizzi, the Cleveland mobster, is in Tennessee right now conducting talkathons in an effort to defeat me." This is the manifest meaning from the language and punctuation employed, and it is the meaning which would be given to the article by the average newspaper reader.

The publication of July 17, 1954 stated:

"OUTSIDERS?

"MEMPHIS—O. D. Bratton, Memphis lumberman, charged in a television speech here yesterday that Rep. Pat. Sutton's major support in his U. S. Senate race comes from outside the state.

"'His talkathon was put on by a man connected with gamblers in Florida,' said Bratton * * *"

Although the plaintiff Venn is not specifically named in this publication, he is described and identified as the man who "put on" the talkathon for Sutton. With this description and identification he is directly referred to as "a man connected with gamblers in Florida." The article, when read as a whole, would appear to convey most clearly the inference that gamblers or gambling interests from outside the state constituted Sutton's major support, and that Sutton's talkathon manager was the connecting link between Sutton and such gambling interests. The defendant's argument that this publication is not libelous per se since the plaintiff's name is not mentioned is without merit. In order for a publication to be libelous per se, it is not necessary that plaintiff's name appear in the publication. If the libelous words refer to an ascertained or ascertainable person they are libelous per se. Bank v. Bowdre Bros., supra, 92 Tenn. at p. 739, 23 S.W. at p. 131. In this instance the plaintiff is clearly an ascertainable person since he is described in accordance with his

official connection with the Sutton campaign and it is immaterial that his actual name was not referred to. The defendant's insistence that the words are not libelous per se because pari-mutuel betting at race tracks was legal in Florida must also be rejected. The test is not whether gambling in some form may have been legal or illegal in Florida. The true test is the meaning which would be ascribed to the language by the average reader of defendant's newspaper, most of whom would be in Tennessee. The Court entertains no doubt that the average reader would consider and construe the words to mean that the plaintiff was connected with gamblers in Florida whose operations were conducted in violation of law.

That the articles of July 15 and 17, 1954, as herein construed and interpreted, as they must be from their four corners alone, are libelous per se appears to be subject to no doubt or uncertainty.

While there is no strict rule of law for determining whether publications are libelous per se, as distinguished from publications that are libelous per quod, the authorities have laid down certain well established definitions and principles which control in the present case.

Newell on Slander and Libel, Second Edition, page 43, states:

"Unfortunately the law of libel has been obscured by a mass of technicalities and subtle refinements. When language is used concerning a person or his affairs, which, from its nature, necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss, its publication prima facie constitutes a wrong, without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; and this is all that is meant by the term 'actionable per se'. Therefore, the real practical test, by which to determine whether special damage must be alleged and proven in order to make out a cause of action for defamation, is whether the language is such as necessarily must, or naturally and presumably will, occasion pecuniary damage to the person of whom it is spoken."

Words injurious upon their face without the aid of extrinsic proof are defamatory per se. Sweeney v. Newspaper Printing Corp., 177 Tenn. 196, 147 S.W.2d 406; Hinson v. Pollock, 159 Tenn. 1, 3, 15 S.W.2d 737; Wilson v. Gadd, 4 Tenn.App. 582, 586; Mattson v. Albert, 97 Tenn. 232, 234, 36 S.W. 1090.

Libels on private persons have been thus classified: (1) Libels which impute to a person the commission of a crime; (2) libels which have a tendency to injure him in his office, profession, calling, or trade; and (3) libels which hold him up to public scorn and ridicule. Hinson v. Pollock, supra, 159 Tenn. at p. 3, 15 S.W.2d at p. 737. The present case falls in the last two categories.

Both publications (July 15 and July 17) referred to the plaintiff and his principal activity, the television talkathon. In the field of public relations and publicity, and particularly in the political area, where the spotlight is turned relentlessly not only upon the candidate himself, but also upon the background, reputation and standing of those with whom the candidate is identified, anyone seeking favorable publicity and public support would naturally shun and avoid all contact or association with persons identified or connected with mobsters, underworld characters, gamblers and other nefarious characters. The plaintiff's business activity was that of producing television talkathons for candidates for public office. Statements or imputations that a person so engaged was connected with such elements and characters, when effectively and convincingly presented to the public, would of necessity injure such person's business and occasion him pecuniary loss. The statements are therefore libelous per se. Smith v. Fielden, 205 Tenn. 313, 320, 326 S.W.2d 476; Fry v. McCord Bros., 95 Tenn. 678, 684, 33 S.W. 568; Bank v. Bowdre Bros., supra,

92 Tenn. at p. 736, 23 S.W. at p. 131; Dupont Engineering Co. v. Nashville Banner Pub. Co., M.D.Tenn., 1925, 13 F. 2d 186, 192; Hartsell v. Depew, 10 Tenn. App. 141, 143; Restatement, Torts, Sec. 573; 33 Am.Jur., Libel and Slander, Sec. 5.

■■ A person may be defamed by a statement that he associates with persons of notoriously disreputable character or by attributing to him the characteristics of literary or historical figures of ill repute. Restatement, Torts, Sec. 565; Gearhart v. WSAZ, Inc., E.D.Ky., 1957, 150 F.Supp. 98, 109, aff'd WSAZ Inc. v. Lyons; 6 Cir., 254 F.2d 242. The publications here considered would naturally tend to bring the plaintiff into contempt, ridicule and disgrace and thus deprive him of the comforts of society. It is well settled that such publications are libelous per se. Gearhart v. WSAZ, Inc., supra, 150 F.Supp. at p. 109; Hartsell v. Depew, supra, 10 Tenn.App. at p. 143; Restatement, Torts, Sec. 565.

■ The general rule is that publications that are libelous per se are presumed to be false. 33 Am.Jur., Libel and Slander, Sec. 274, a rule which obtains in Tennessee. Hinson v. Pollock, supra, 159 Tenn. at p. 3, 15 S.W.2d at p. 737. But in addition to this legal presumption the entire record in this case affirmatively establishes the falsity and inaccuracy of the statements contained in the articles of July 15 and July 17 with respect to the plaintiff Venn. The clear inference in the July 15 publication that the plaintiff Venn was associated in business with Mickey McBride in carrying on and conducting an interstate gambling wire service which was broken up by the Kefauver committee is conceded to be erroneous. While it is true that the plaintiff was general manager of radio station WMIE in Miami which was owned in part by Mickey McBride, the plaintiff was never connected with McBride in connection with the Continental Press Service which was at one time owned and controlled by McBride, or any other gambling wire service. Also completely false is the statement in the July 15th article that the plaintiff moved in circles with Al Polizzi, "the Cleveland mobster". There is evidence in the record that an Al Polizzi was present at the wedding of McBride's son, which was also attended by the plaintiff. But the overwhelming evidence establishes the fact that the plaintiff did not move in circles with Al Polizzi or with mobsters, gangsters or members of the underworld. Also false is the statement in the July 17th article to the effect that the plaintiff was connected with gamblers in Florida. The truth is as shown by the clear preponderance of the evidence that the plaintiff had no connection with gambling interests in that state or elsewhere.

The plaintiff had enjoyed a successful career in radio and television, having been assistant promotion manager of the National Broadcasting Company at Chicago, sales manager of WRJN at Racine, Wisconsin, and promotion manager of WSGN at Birmingham, Alabama. He was later employed by Storer Broadcasting, operator of a chain of radio and television stations, as promotion and merchandise manager of radio station WAGA at Atlanta, Georgia. Because of his outstanding work at WAGA, he was transferred to Miami on October 1, 1943, to manage the Storer company's radio station WGBS. During his tenure as managing director of WGBS, he formed the Southern Radio and Television Equipment Company, parent organization of Miami's first television station, WTVJ. In 1948, he left the Storer organization to join Lincoln Operating Company, and he later became general manager of radio station WMIE at Miami. In the early 1950's, he left the employ of WMIE to enter private business. From 1952 to 1954, his efforts were devoted principally to the production of television talkathons, a venture which proved to be profitable. His excellent reputation for ability, industry and integrity in his profession is shown by the testimony of numerous character witnesses. The record further discloses that in his participation in various publicity and political campaigns, his servic-

es were utilized by those persons and organizations opposing gamblers and criminal elements and by political candidates running on platforms calling for rigid law enforcement.

The publications of July 15 and July 17, 1954 being libelous per se, and it being established affirmatively by the evidence that such publications were false with respect to the plaintiff, next to be considered are certain affirmative defenses interposed by the defendant. The defense that the publications are privileged as reports of official proceedings of the Federal Communications Commission and the Senate Crime Committee have no application to the two articles of July 15 and July 17, which the Court holds to be libelous per se. The articles show on their face that they are not reports of such proceedings but rather are accounts, or probably more accurately partial and fragmentary accounts, of speeches made by Senator Kefauver and a Kefauver supporter in Memphis.

Also without merit is the defense that the defendant had the qualified privilege to comment fairly and reasonably upon a matter of public interest. It is well settled that the privilege of fair comment does not apply to statements of fact but only to comments upon facts or expressions of views or opinions. Restatement, Torts, Sec. 606, and Comments.

The libelous imputations and statements in the articles of July 15 and July 17 to the effect that Venn was associated in business with McBride in carrying on an interstate wire service, that he moved in circles with a Cleveland mobster, and that he was connected with gamblers in Florida, are unadulterated imputations or statements of fact and by no stretch of the imagination could they be classified as comments or expressions of views or opinions upon a matter of public interest.

As a further defense directed to the publications of July 15 and July 17, the defendant in its brief states: "In public affairs a newspaper is entitled to quote a speech favoring the election of a Senator, if it does so accurately * * *." It it further argued that the defendant was privileged to quote in its newspaper the speeches made by Senator Kefauver and his supporters and is not answerable for any libelous statements made therein so long as the speeches were correctly quoted.

In the first place, as appears from the face of the publications, they are not simply quotations from the two political speeches but consist in part of statements made by the defendant itself. Thus in the July 15th article the unequivocal statement is made by the defendant that Kefauver had "tied in Sutton with nationwide criminal elements * * *" A quotation from the Kefauver speech follows this statement. In the publication of July 17, 1954, before quoting from the Bratton speech, the defendant itself stated that Bratton, a Memphis lumberman, "charged in a television speech here yesterday that Rep. Pat Sutton's major support in his U. S. Senate race comes from outside the state." Furthermore, it is not contended by the defendant that it reported the two speeches in full, and there is no way of knowing whether the statements made which were critical of Venn were in any way modified or explained in other parts of the political speeches. Were the quotations from the speeches correct quotations as argued by the defendant in its brief? The proof is silent upon this subject. No evidence was offered by the defendant to establish that the speeches were accurately quoted from in the defendant's newspaper. For this reason alone it would seem that the defendant would not be entitled to rely upon the special defense that it was privileged to quote from the two speeches. 53 C.J.S. Libel and Slander § 219(a).

But aside from these considerations the theory of the defendant that it has immunity to quote correctly from political speeches is not supported by the authorities. Where a newspaper publishes slanderous statements made in

political speeches, it must in order to avoid liability, either justify the statements and prove them to be true, or rely upon their being fair comments upon matters of public concern. The rule is clearly stated by Newell as follows:

"At common law if a person publishes an account of the proceedings of any meeting of a town council, of the shareholders in any company, of the subscribers to any charity, or of any public meeting, political or otherwise, and such account contains expressions defamatory of the plaintiff, the fact that it is a fair and accurate report of what actually occurred will not avail as a defense, though it may be urged in mitigation of damages, unless the case comes within the preceding sections. By printing and publishing the statement of the speakers he makes them his own; and must either justify and prove them strictly true, or rely upon their being fair comments on a matter of public interest made in good faith." Newell, supra, Sec. 468.

There are sound reasons for the rule. "The first utterer may have been a person of bad character, or insane, or in a state of intoxication. Slander by such a person would not receive much attention." Gatley, Libel and Slander, Sec. 164. Moreover, the utterance may have been heard by only a few persons. If, however, the calumnies are reproduced in the columns of a reliable and widely circulated newspaper, the injury may become irreparable. The possible consequences of such reproduction and republication are thus stated by Newell:

"The consequences of reproducing in the papers calumnies uttered at a public meeting are most serious. The original slander may not be actionable in itself, or the communication may be privileged; so that no action lies against the speaker. Moreover, the meeting may have been thinly attended, or the audience may have known that the speaker was not worthy of credit. But it would be a terrible thing for the person defamed if such words could be printed and published to all the world, merely because they were uttered under such circumstances at such a meeting. Charges recklessly made in the excitement of the moment will thus be diffused throughout the country, and will remain recorded in a permanent form against a perfectly innocent person. We cannot tell into whose hands a copy of that newspaper may come. Moreover, additional importance and weight is given to such a calumny by its republication in the columns of a respectable paper. Many people believe it merely because it is in print. There is in fact an immense difference between the injury done by such a slander and that caused by its extended circulation by the press." Newell, supra, Sec. 469.

These principles were recognized by the Court of Civil Appeals of Tennessee in its opinion in Anderson v. Featherly, 6 Tenn.Civ.App. 94, wherein it stated:

"The uniform rule is that an article imputing to a lawyer lack of knowledge or capacity to follow his profession is actionable *per se*, and that it is unnecessary to aver special damages: 4 Ba.Br., 451; Dauney v. Holloway, 3 Br.Rul. Cases, 54; 25 Cyc., 333; Sanderson v. Caldwell, 6 Am.Dec., 105. This is peculiarly true of written slander as contradistinguished from oral slander. The framers of the common law wisely made this distinction, and we should not disregard it. A casual remark that a lawyer is ignorant may soon pass away. Indeed, this is often said of fairly good lawyers, and is forgotten ere it is spoken. But when it is embalmed in print and sent over the land and read by people who are disposed to accept anything in print as literally true, the injury inflicted is deep-seated. And it is for this reason that the common law requires a more liberal interpretation of the written than of the

spoken word, and justifies more readily a resort to the tribunals for vindication." 6 Tenn.Civ.App. at pp. 99–100.

These views are not in conflict with Westbrook v. Abell Co., and Pulverman v. Abell Co., 228 F.2d 797 (4th Cir.) and other authorities cited by defendant. The Westbrook and Pulverman decision did not turn upon a qualified privilege to publish statements of political speakers provided such statements are quoted accurately. The Court not only found that the publications contained no misstatements of fact, but also found that the remarks of General Eisenhower published by defendant were fair comments upon the admitted facts.

The defendant has pleaded the Tennessee statutes of limitation. Section 28–304 of the Tennessee Code provides that actions for libel shall be commenced within one year after the cause of action accrued. Section 1–302 provides that the time within which any act provided by law is to be done, shall be computed by excluding the first day and including the last, unless the last day is Sunday and then it shall also be excluded.

The first publication complained of was on July 3, 1954. On Monday, July 4,1955, and within the time allowed by the above Code sections, plaintiff brought suit against the defendant in the Circuit Court of Davidson County, Tennessee, setting out the same causes of action that are alleged herein. That case came on for trial on October 28, 1957. On October 30, 1957, after plaintiff's first witness had testified and after plaintiff had testified in chief, and while being cross examined by defense counsel, plaintiff moved for leave to take a voluntary nonsuit, which motion was granted by the Circuit Judge. On December 5, 1957, plaintiff instituted the present action and invoked T.C.A., § 28–106, which provides:

"If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding his right of action, or where the judgment or decree is rendered in favor of the plaintiff, and is arrested, or reversed on appeal, the plaintiff, or his representatives and privies, as the case may be, may, from time to time, commence a new action within one (1) year after the reversal or arrest."

■ This section of the Tennessee Code is applicable to the present case, and the action, having been brought within one year after the vountary non-suit in the Circuit Court, is saved from the bar of the one-year statute of limitations. Smith v. McNeal, 109 U.S. 426, 431, 3 S.Ct. 319, 27 L.Ed. 986 ; Sinclair Refining Co. v. Bennettt, 6 Cir., 1941, 123 F.2d 884 ; Privett v. W. Tenn. Power & Lt. Co., W.D.Tenn., 1937, 19 F.Supp. 812, aff'd 6 Cir., 103 F.2d 1021. Cf. Partin v. Wade, 8 Cir., 1949, 172 F.2d 50; Lauritzen v. Atlantic Greyhound Corp., E.D. Tenn., 1948, 8 F.R.D. 237 ; Federal Reserve Bank of Richmond v. Kalin, 4 Cir., 1936, 81 F.2d 1003, 1007 ; Harrison v. Remington Paper Co., 8 Cir., 1905, 140 F. 385, 398.

The cases of Eager v. Kain, E.D.Tenn., 1957, 158 F.Supp. 222, and Brent v. Town of Greeneville, 203 Tenn. 60, 309 S.W.2d 121, cited by defendant, are not·in point.

Eager v. Kain, supra, was an admiralty suit first brought in the state court. Thereafter, the defendant filed a petition in the federal court to limit liability (or for exoneration). The plaintiff moved to dismiss so he could proceed in the state court. The motion was granted and the cause was remanded. At the close of the trial in the state court, the defendant moved for a directed verdict. The Court was about to rule favorably on the motion when plaintiff asked for and was granted a non-suit. The plaintiff then brought the action in the federal court. In dismissing the case, District Judge Darr did not hold that Sec. 28–106 was inapplicable, but merely declined to entertain jurisdiction. His holding, and the reasons therefor, are clearly set out in the con-

cluding paragraphs of his decision, as follows [158 F.Supp. 223]:

"The accident giving rise to this claim occurred on April 14, 1954, and this suit was filed on May 29, 1957, more than three years after the accident. The Tennessee procedure allows actions to be brought within a year of the time when a suit has been dismissed without prejudice, 28 T.C.A., 106, but this Court does not feel that it *must* entertain such an action where it would not have ordered the dismissal.

"The plaintiff has had an opportunity to file a claim in this court in admiralty. He declined to do so. He has had, *and still has*, an opportunity to have a full hearing in the state court, including the right to appeal to the highest court of the state if not satisfied. And yet he is trying to persuade this Court to entertain his suit under circumstances foreign to the provisions of the Federal Rules of Civil Procedure. This Court, therefore, *declines to entertain jurisdiction of this case.*" (Emphasis added.)

Brent v. Greeneville, supra, simply held that Section 28–106 is not operative where a statute creating a right of action limits the time within which the right can be exercised.

The plaintiff here has not indulged in the "forum shopping" so evident in Eager v. Kain, supra. This is particularly apparent in the light of the record of the Circuit Court proceedings which has been filed as Defendant's Exhibit No. 4. The Court therefore holds that the plaintiff is entitled to the benefits of T.C.A., § 28–106, and that the action was timely filed.

 Since the publications of July 15 and July 17 are libelous per se, general damages are presumed and may be recovered without proof of actual pecuniary loss. Smith v. Fielden, supra, 205 Tenn. at p. 320, 326 S.W.2d at p. 480; 33 Am.Jur., Libel and Slander, Sec. 282; 12 A.L.R.2d (Anno.) 1014; 53 C.J.S. Libel and Slander § 262 et seq. Elements of general damages, which the law presumes or infers, without proof that they have been incurred, include injuries to character or reputation, injuries to feelings or mental suffering or anguish, and other like wrongs and injuries incapable of monetary valuation. 53 C.J.S. Libel and Slander § 262a. An indefinite loss of business is considered general damages. Fry v. McCord, supra, 95 Tenn. at p. 688, 33 S.W. at p. 568. And while such damages are presumed and need not be proved, competent evidence tending to prove any loss or injury sustained by the plaintiff in consequence of the publication sued on is nevertheless admissible to support the legal presumption of injury and to show its extent. 53 C.J.S. Libel and Slander § 264a. These principles were succinctly stated by the Supreme Court of Tennessee in the recent case of Smith v. Fielden, supra [205 Tenn. 313, 326 S.W.2d 480], as follows:

"If the relationship of the slanderous words to the calling or profession appears from an inspection of the words themselves, they are said to be libelous per se; general damages are presumed, such as injuries to character, reputation, feelings, etc., and the general effect upon plaintiff's business."

A number of factors which have been considered by the Court in determining the nature and the amount of damages to be awarded should be discussed in some detail. Plaintiff's claim to a large monetary award is based primarily upon an alleged destruction of the talkathon and a total loss of income therefrom. But the evidence that the plaintiff would have continued to enjoy a substantial income from the Talkathon is to some extent dependent upon conditions in the future which could not be predicted with certainty.

Further, while the plaintiff ultimately suffered a total loss of income from his talkathon activities, the record makes it altogether clear that such loss cannot in any event be attributed solely to the publications in defendant's newspaper. The circulation of the Nashville Tennessean

was confined principally to Middle Tennessee. Similar defamations of the plaintiff were published in West Tennessee in the Press-Scimitar, a metropolitan daily newspaper published in Memphis. Before the present suit was filed, plaintiff instituted a libel action against the Memphis Press-Scimitar because of those defamations and collected from that newspaper $7,500.00 in an out-of-court settlement. And while the evidence is not entirely clear, it appears that plaintiff recovered a judgment against, or received a cash settlement from, an Arkansas newspaper because of similar defamations. Similar articles concerning Venn and the talkathon were published in the New York Daily News, the St. Louis Post-Dispatch, the Arkansas Gazette, and the Atlanta Journal, all of which are nationally known and widely read newspapers. Some of the injury to plaintiff's reputation must necessarily be attributed to those publications. Although income from talkathon programs was lost, plaintiff's individual income tax returns, which the Court will not attempt to analyze in this opinion, indicate that his total income from all business activities did not suffer a substantial reduction until the year 1957, long after the publications in defendant's newspaper complained of herein.

The only claim for special damages set out in the complaint is as follows (Paragraph 31):

"In addition, plaintiff suffered shortly after the said libel, a loss of $2,000.00 contracted to be paid, or which would have been paid by Charles E. Gowen, because said Gowen would not permit plaintiff to conduct a talkathon in Georgia in the fall of 1954, for which plaintiff had already been engaged, on account of the said libelous articles."

Mr. Gowen, who was a candidate for the Democratic nomination for governor of Georgia, testified that after making arrangements for Venn to conduct a talkathon in his campaign, he was shown certain articles in the Atlanta papers concerning charges that had been made concerning Venn in the Tennessee campaign, and he advised Venn that he could not have Venn identified with his campaign. Venn was thereupon forced to withdraw, but the talkathon was subsequently produced by Venn's partner, Reggie Martin. Mr. Gowen did not mention the articles or charges made in the *Tennessean*; he referred only to charges that had been made *in the Tennessee campaign*. It is to be remembered that those charges were made in speeches by Senator Kefauver himself and by his supporters, and also by the Memphis Press-Scimitar. From Mr. Gowen's testimony, a portion of which is set out in the footnote,[1] it is evident that his refusal to have Venn identified with his campaign was occasioned by articles published in the Atlanta newspapers, and not by the Tennessean's publications. The claim for $2,000.00 as special damages must therefore be denied.

The Court has considered the evidence relative to the ownership of the talkathon, both as a trademark or trade name and as an exclusively owned device or

1. "Q–19. Will you go ahead, Mr. Gowen, and tell us your next connection and what, if anything, or any modifications were made with respect to the arrangements you have just mentioned?

"A–19. First, we looked around to see if we could get the $10,000; * * * some of my friends * * * called me, wherever I was, and told me they had arranged the money to put on the talkathon. I then got with the others and Frank Gross, my campaign manager, and we met in Atlanta with Bob Venn, I think either August 1st or 2nd, I wouldn't swear the date, at my headquarters in the Henry Grady Hotel. Just the week before sometime I had been handed an article in one of the Atlanta papers stating that charges had been made in the Tennessee campaign that Bob Venn was associated in some manner with a horse racing or bookie racket in Miami and just a day or so before that—I believe it was the Sunday paper, I am not sure about that—Drew Pearson carried an article in the Atlanta Journal which mentioned the same charges."

method. The plaintiff's testimony that he owned the talkathon and the exclusive right to the income derived therefrom is substantially refuted by his own witnesses. His former partner, Karl Bishopric, Jr., who, with plaintiff and Reggie Martin, formed a partnership for the sole purpose of producing talkathon programs, testified that the word "talkathon" was in the public domain but that the methods used by the partnership were protected by "common law" copyright; also, that talkathon programs were produced by the corporation of Houck & Co. and that Venn managed the programs as an employee of that corporation. This testimony is substantially corroborated by the plaintiff himself. It further appears from the testimony of Mr. Gowen that a program of similar nature which was called a "Peoplethon" was later used in another political campaign in Georgia. The plaintiff concedes that the name "talkathon" was not protected by copyright. The Court therefore concludes that the so-called "talkathon" was in no sense "property," and that plaintiff was not vested with the exclusive right to the income derived therefrom.

From the entire record, the conclusion is inescapable that plaintiff's success in producing talkathon programs was due solely to his business acumen, industry and promotional and executive ability, and not to an exclusive right to produce such programs.

Finally, the Court cannot conclude from the record in this case that the so-called talkathon program, as an effective publicity method or device, was actually destroyed. It was twice used successfully by Mr. Gowen in the Georgia gubernatorial primary election after the charges against Venn in the 1954 Tennessee campaign were given wide publicity; and, as heretofore pointed out, a similar program called the "Peoplethon" was later used successfully in another Georgia political campaign. If the program had become permanently established as an effective publicity device to the extent claimed by plaintiff, its effectiveness could not have

been destroyed by the defamation of one individual.

On the question of damages, the issue of actual malice must be considered, the rule being that actual malice may be looked to in aggravation of actual damages. 53 C.J.S. Libel and Slander § 248. Also, actual malice may be the basis for imposition of punitive damages. Saunders v. Baxter, 53 Tenn. 369; 33 Am.Jur., Libel and Slander, Sec. 288. Without reviewing in detail the evidence pro and con upon this particular issue, the Court is constrained to hold from the entire record that there was no actual malice on the part of the defendant in the publications complained of. There are some circumstances of a rather cogent nature which, if they stood alone, might indicate actual malice. For example, there is some evidence that the defendant, before it began the series of publications complained of, had good reason to believe that the plaintiff had no questionable connections with the underworld and that any imputation or charge against him that he was a conscious link with the underworld and as such was engaged in an effort to defeat Kefauver could not stand up. Also it was shown that the defendant refused to make a retraction after two demands by the plaintiff; and that although it maintains an excellent news coverage of the daily activities of this Court, it failed to publish any news account of the present proceeding. However, there are other circumstances which, after careful consideration, have drawn the Court to the conclusion that a finding of actual malice on the present record would not be justified.

It must be remembered that the primary campaign between Sutton and Senator Kefauver was a very bitter one in which serious charges and counter charges were made by the respective candidates. It would appear that a campaign of this nature was actually initiated by Sutton in charging that Senator Kefauver had the support of Communists and persons of communistic leanings. This charge was met by Senator Kefauver and his supporters in charging that Sutton

had the support of the underworld because of Senator Kefauver's disclosures growing out of the investigations of the Senate Crime Committee. In this situation the defendant, as a supporter of Senator Kefauver, was naturally interested in seeing that his cause was widely and effectively presented to the public, particularly the contention of Kefauver and his followers that Sutton's campaign was being backed by underworld interests and money. The most that could be said is that the defendant undertook to convince the public of this fact, but this is a far cry from saying that the defendant had a wilful motive or purpose to destroy Venn, the talkathon manager of Sutton. The fact was true that Venn had formerly been associated in business with Mickey McBride in that he managed a radio station which was in part owned by McBride, and this fact was referred to in practically all of the publications. Much of the information upon which the defendant acted was conveyed to it by other newspapers or independent columnists, and while this is no excuse for a libelous publication, it is nevertheless a circumstance to be weighed in the determination of actual malice. It was additionally true that Venn did take a leading part in the Sutton campaign in that he staged and put on a type of program which was not only expensive but was novel in political campaigns in Tennessee, and it would have been most difficult for the defendant to publish the leading events connected with the campaign without referring to the plaintiff and without pointing out his prior activities in the radio and television field. The evidence showed that Venn not only conducted the talkathon himself but that he also helped to a certain extent in raising money for the Sutton campaign, and otherwise helped and advised Sutton.

It is no exaggeration to say that he was one of Sutton's principal advisers, certainly in the publicity aspects of the campaign.

Considering the entire record, the Court is of the opinion first, that plaintiff has failed to prove special damages; second, that there being no actual malice in connection with the publications, the plaintiff is not entitled to punitive damages; and third, that the plaintiff can be adequately compensated by an award of general damages.[2] Such award of general damages in the light of all relevant factors and the entire record should be in the amount of $10,000.00.

A form of judgment will be submitted accordingly.

## SUPPLEMENTAL MEMORANDUM

The Court has heretofore entered its opinion directing the entry of judgment in favor of the plaintiff, after finding and holding that the publications in the defendant's newspaper of July 15 and 17, 1954 were libelous per se. The Court is of the opinion that its views with respect to the July 15th publication should be set forth in more detail.

The pertinent parts of the July 15th article are as follows:

"KEFAUVER LASHES
SUTTON'S BACKERS

"Says Opponent Gets
Support of Criminals
Oil Rich Texans

"KINGSTON, Tenn.—Sen. Estes Kefauver declared at a rally of Roane County Democrats here last night that his opponent is receiving the support of nationwide criminal elements and oil-rich Texans.

\*　　\*　　\*　　\*　　\*　　\*

2. Defendant insists that during the trial plaintiff's attorney abandoned or waived all claims for damages to his personal reputation and limited his claim to damages to profits derived from the talkathon. But upon consideration of the statement made by plaintiff's attorney the Court is satisfied that he merely intended to admit the fact which defendant's

attorney was seeking to develop by cross-examination, i. e., that the plaintiff was doing well and was at that time enjoying a successful business. A waiver of a claim to general damages should not be found in the absence of a clear and unequivocal expression of intent. Such intent cannot fairly be found from the record in this case.

"In an hour-long speech, the senator tied in Sutton with nationwide criminal elements this way:

" 'You know we all like to be friendly with everybody. But sometimes we are known by the enemies we make. Likewise we are known by the company we keep.'

"Then Kefauver proceeded to describe the company that is now being kept by Sutton.

"*Referring to activities of the senate crime investigation committee, which he headed several years ago, in breaking up the interstate gambling wire services, headed by Mickey McBride, Kefauver said:*

" '*Bob Venn, who was in business with Mickey McBride—the man who headed the largest of these services —and who moved in circles with Al Polizzi, the Cleveland mobster, is in Tennessee right now conducting talkathons in an effort to defeat me.*'

"Associating Sutton with another segment of the nation's underworld, Kefauver briefly reviewed the history of exposing gambler Frank Costello \* \* \*" (Emphasis added.)

That this publication is unequivocally and unambiguously defamatory of Venn appears even from a cursory examination of it. There are at least three meanings imparted by the article as to Venn—two by necessary inference and one by direct assertion—each of which is libelous per se.

First, there is the direct assertion that the plaintiff Venn "moved in circles with Al Polizzi, the Cleveland mobster." Defendant argues that the article when properly construed means that Mickey McBride moved in circles with Al Polizzi and not the plaintiff Venn. But the Court is convinced that this is a mistaken view. Although Senator Kefauver in his speech may have intended to imply that Mickey McBride moved in circles with Al Polizzi, the paragraph as written in defendant's newspaper does not permit this interpretation. By use of the two dashes, the defendant parenthesized and isolated the

words "the man who headed the largest of these wire services" in such way as to make them apply and refer to McBride, leaving the remainder of the sentence to apply and refer only to the plaintiff Venn. In this manner the sentence is made to impart precisely the same meaning as if it were composed: "Bob Venn, who was in business with Mickey McBride and who moved in circles with Al Polizzi, the Cleveland mobster, is in Tennessee right now conducting talkathons in an effort to defeat me." This is the manifest meaning from the language and punctuation employed, and it is the meaning which would be given to the article by the average newspaper reader.

Second, the imputation that plaintiff Venn in conducting the talkathon in the Sutton campaign was a conscious and knowing "link" or "tie-in" with the underworld and criminal elements of the nation unmistakably appears from the article. The main thrust of the article is to drive home the idea that Sutton's campaign was linked with criminal elements and supported by the underworld, an idea first stated in the headlines, then in the body of the article. But to prove this point it is necessary to have a connecting link, and that link, as the article plainly shows, is Venn. Having first stated unequivocally that Kefauver "tied in Sutton with nationwide criminal elements", the defendant proceeded to quote from his speech to show how such a tie-in had been accomplished. The tie-in is simply, easily, and directly established by first suggesting that "we are known by the company we keep", and then showing that Sutton is "keeping company" with Venn in his campaign in having him "in Tennessee right now conducting talkathons in an effort to defeat me." This connects Sutton with "nationwide criminal elements" because Venn was "in business with Mickey McBride", the man who headed the interstate gambling wire services broken up by the senate crime investigation committee. Thus Venn is effectively and unmistakably depicted as a tool of the underworld and as its agent in Tennessee to help defeat Kefauver.

Third, the clear import of the article is that Venn was in business with Mickey McBride in carrying on an interstate gambling wire service, broken up in a senate crime investigation headed by Kefauver. The unqualified statement is made that Bob Venn was "in business with Mickey McBride", and the only business of McBride's referred to in the article is that of heading the largest of the interstate gambling wire services broken up by the senate crime investigation committee. The average reader would necessarily conclude that such was the business connection referred to. Nowhere in the article is there a reference to any other business carried on by McBride, and nowhere is it explained (as it is in most of the other articles upon which the action is predicated) that Venn had been associated with McBride in a perfectly legitimate business enterprise in managing radio station WMIE in Miami of which McBride was part owner.

Thus, by any possible view of the article, the full impact and weight of its condemnation of the Sutton campaign as supported and backed by criminal elements are made to fall upon Venn.

There can be no doubt from the record that the article of July 15th is altogether false in its imputations and statements as to the plaintiff Venn, either that he was a link with the underworld, or that he was in business with McBride in carrying on an interstate gambling wire service, or that he moved in circles with Al Polizzi, the Cleveland mobster. As the article contains such false imputations and statements of fact as distinguished from expressions of views or opinions based upon correct statements of fact, the defense of privilege of fair comment is inapplicable. Restatement, Torts, Sec. 606.

The judgment to be submitted will direct that the opinion heretofore entered as supplemented by this supplemental memorandum shall constitute the Court's findings of fact and conclusions of law.