Vincent A. CIANCI, Jr.,
Plaintiff-Appellant,

v.

NEW TIMES PUBLISHING COMPANY, New Times Communications Corp., MCA, Inc., George A. Hirsch, Jonathan Z. Lalsen and Craig Waters, Defendants-Appellees.

No. 948, Docket 80–7030.

United States Court of Appeals,
Second Circuit.

Argued March 27, 1980.

Decided July 11, 1980.

As Modified on Denial of Rehearing
Oct. 27, 1980.

Seymour Shainswit, New York City (Kronish, Lieb, Shainswit, Weiner & Hellman, Edward M. Spiro, New York City, of counsel), for plaintiff-appellant.

James F. Rittinger, New York City (Satterlee & Stephens, Robert M. Callagy and Nancy K. Cassidy, New York City, of counsel), for defendants-appellees.

Before FRIENDLY and MESKILL, Circuit Judges, and THOMSEN, District Judge.*

FRIENDLY, Circuit Judge:

In this action in the District Court for the Southern District of New York, 486 F.Supp. 368,[1] Vincent A. Cianci, Jr. complained of alleged libels printed in the July 24, 1978 issue of "New Times" magazine. Cianci had been Mayor of Providence, R.I., and at

---

* United States District Judge for the District of Maryland, sitting by designation.

1. Federal jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332(a).

the time of the publication was seeking reelection, which he won. The defendants were New Times Publishing Co. and New Times Communications Corp., which owned and circulated New Times; MCA, Inc., which allegedly dominated and controlled them; and three individuals, to wit, the publisher and the editor of New Times and the author of the article.

The cover of the July 24, 1978 issue of New Times bore a photograph identified as "Vincent 'Buddy' Cianci Mayor of Providence, R.I." and a legend reading:

> Was this man accused
> of raping a woman at
> gunpoint 12 years ago?
> by Craig Waters.

The article itself carried a headline in large and heavily blacked type:

## BUDDY
## WE HARDLY KNEW YA

followed by five lines, also in bold face and larger than normal type:

> Twelve years ago, in a suburb of Milwaukee a law student was accused of raping a woman at gunpoint. After receiving a $3,000 settlement, she dropped the charges and the incident was nearly forgotten. That student, Vincent "Buddy" Cianci, Jr., is now the mayor of Providence, Rhode Island.

The article stretched over seven pages. Interspersed with the text were four boxes, also in bold face and larger than normal type, highlighting passages from the article. One of these inner headlines asserted:

> Redick took the lie detector test and passed; Cianci took it three times and failed each time.[2]

Another said:

> Redick has confirmed her account, and says that she did receive a $3,000 payoff.

After some preliminaries, the article quoted liberally from a statement allegedly made by Redick to the article's author in 1978, relating in detail what she claimed to

have taken place on the evening of March 2, 1966. In summary, she reported that while she was walking home from work in Milwaukee, Wisconsin, she was picked up by a man, subsequently identified as Cianci, driving a big black car. Cianci called her by name, stating that he knew a friend who worked with her, and asked if she wanted to do some part-time work for the Marquette Law School, where he was a student. Redick's first reaction was negative; she said she had to go to the studio club where she resided and change her clothes. While doing this, she changed her mind and so informed Cianci who had sat in his car for half an hour while she was in the studio club. The two took off in the car. When Redick asked why the journey to the office was taking so long, Cianci answered that his office was in his home in River Hills, a suburb of Milwaukee. The house did contain an office "like a study or den . . .". Cianci offered her a drink, "a rum and Coke", which she accepted. Afterward she felt "like I was drugged." Cianci then "started coming toward me, and trying to kiss me and trying to make out with me." After some conversation Cianci pulled her into the bedroom; Redick countered with a threat to call the police. Cianci then threatened her with a gun, taken from a drawer in a nightstand by the bed, and also threatened to throw her into a ravine outside the window. As the article quoted Redick, "I couldn't fight him off any longer . . . and he raped me." Ultimately, when Cianci went to the bathroom, Redick called a cab. When the driver arrived, Cianci "acted very cool", saying "We had a wonderful time, and I'll call you . . . We'll go out to dinner sometime."

After passing out at the studio club and then sleeping there, Redick told the story to an unidentified friend. The police were notified. Redick went to the police station at River Hills, was examined by a physician with unstated results, spoke to the police, filed a written complaint and "was grilled

---

**2.** "Gayle Redick" was a substitute used in the article for the true name of the alleged victim. We shall continue that usage.

by authorities for more than 14 hours." On the morning of March 4 she was asked to identify Cianci. The confrontation occurred in a judge's chambers. Cianci assumed an attitude resembling that before the taxi driver, saying "Hi there!" Didn't we have a great time last night?" The next day Redick took an overdose of sleeping pills and was hospitalized for a brief period.

The State Crime Laboratory reported the finding of a pistol in operating mechanical condition and of three empty glasses which were examined for drug residue with negative results.[3] The report continued:

> The bedsheet was examined for the presence of semen. Semen was identified chemically in one area and intact spermatozoa were also identified at that spot . . . Human blood was identified in small spots on the pillowcase and also on the sheet . . . Traces of blood were identified at the crotch area of the victim's panty girdle. The amount was insufficient for further tests.

The article continued to state as a fact that Redick took the lie detector test and passed, whereas Cianci took it three times and failed each time. This was followed by a quotation from a report by Harold Block, a River Hills police lieutenant in 1966:

> . . . According to State Crime Lab expert, Joe Wilamovsky, the report on the polygraph test showed this to be one of the most clear cut cases of rape he had ever processed in his years with the State Crime Lab. In his opinion, Gayle Redick passed the test beyond a shadow of doubt while Cianci failed completely on three separate testings. . . .

3. The report explained:
   It would be very difficult to make an identification under these circumstances unless the glass had contained a solution with a relatively high concentration of drug . . .

4. In fact Block's report, to which the author had access, stated that Assistant District Attorney Boyle reported to him that on April 16, 1966, Redick "withdrew her complaint and is starting a civil action." Cianci's version was that nothing was paid for the withdrawal of the complaint but that, on the advice of counsel, he paid $3,000 in settlement of the civil charges,

The article proceeded with a statement by Redick that her attorney did not think she was well enough to go on with the case and told her "to drop the charges and settle out of court." It quoted her as saying she had received a settlement of $3,000 and went on to state that she withdrew her complaint and a decision was made that Cianci would not be charged sometime prior to June 29, 1966.[4] In what was characterized as his "final report", Block is alleged to have noted that District Attorney Hugh O'Connell felt that "due to lack of evidence, prosecution was almost impossible." Assistant District Attorney Boyle was stated to have explained recently that the lack of evidence stemmed from the fact that "[t]he victim, presumably the star witness, settled out of court, and would therefore probably not be willing to testify; and, at that time, the results of the lie detector tests were not admissible as evidence in Wisconsin."[5]

The article then moved back to 1977, when a young Providence reporter went to work for a Milwaukee television station. She met one Alan D. Eisenberg, a controversial Milwaukee lawyer who had been a law school classmate of Cianci. Eisenberg allegedly had acted as a procurer of women for Cianci and had thought him to be the possible rapist described in a March 5, 1966 story in the *Milwaukee Sentinel*. Eisenberg said that, when he talked to Cianci, the latter replied that the report was "a shakedown" and he was having a local lawyer handle it. Eisenberg led the reporter to Block, who had become River Hills Chief of Police. He furnished them with a copy of what they believed to be Cianci's complete police file. Eisenberg and the reporter lo-

particularly because, having finished law school, he was leaving Milwaukee to return to Providence and subsequently to enter the armed services, and it would be inconvenient for him to be obliged to appear in Milwaukee.

5. The results of lie detector tests are now admissible in Wisconsin for the limited purposes of corroboration or impeachment but only if there has been a prior stipulation concerning admissibility entered into by all concerned parties. See *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974).

cated Redick, now happily married. The article says she "confirmed her rape charge against Cianci and discussed the $3,000 settlement." Shaken by what the article described as the reporter's "hard-nosed techniques", Redick called her 1966 attorney who indicated he wanted no part of the case but did advise the reporter to drop the story. When the reporter again called Redick, the latter had hired a new attorney. The article alleged that, after intervention by Cianci's counsel, the new attorney wrote a letter to them saying that his client had no complaint with the way in which the case had been handled, and that Eisenberg and the reporter had obtained information from Redick by threat and intimidation.

After recounting the refusal of the Milwaukee and Providence television stations to broadcast the story, the article went on to tell how a female acquaintance of Eisenberg brought the story to the attention of several friends in the media. She found a receptive audience in Bert Wade, a reporter for the *Providence Journal* who, with a colleague, flew to Milwaukee, had dinner with Eisenberg and spoke to Block. They discovered that the police file was no longer available; Redick's attorney explained that the records were legally required to be destroyed at the complainant's request. Although the writer of the article later ascertained from Redick's lawyer that this had been requested, the article states, apparently quite gratuitously: "(The police file may, in fact, have been sealed by the village attorney, and not destroyed)." The reporters "checked out leads and sources— the district attorney, the Milwaukee County medical examiner, the dean of Marquette Law School, Robert F. Boden." They then made plans for their story to be published on page one of the Sunday *Providence Journal.* Cianci declined to meet with a city hall reporter for the *Journal,* but a meeting was held between Cianci and his advisors and two editors and the paper's attorneys at which the former group claimed that Wade had made some demonstrably false accusations against Cianci in order to coax information from Dean Boden [6] and raised questions about the reliability of the paper's sources. When the editors returned, they informed the writer of the story that a serious problem had come up and that the story would not be running on Sunday. When the paper "learned that the victim might not cooperate in the event of a lawsuit, the plug was pulled and the last rites reluctantly read." After discussing the "ripple effect" of the *Journal's* refusal to publish, the article began its concluding portion by saying:

If, as it was once claimed, the entire matter was merely a shakedown, it was definitely of the nickle and dime variety: For the nominal sum of $3,000, Cianci had managed to buy his way out of a possible felony charge.

It continued:

Unlike tryst-and-tell heroines Judith Exner and Elizabeth Ray, Redick hasn't attempted to capitalize on her experience. Since she was first caught off guard by Eisenberg and the television reporter, Redick has been reluctant to talk about the alleged rape. She has confirmed her account for several journalists and says that she did receive a $3,000 payoff, but doesn't want to discuss the details. The reticence seems borne not of moral doubt —"I have . . . daughters, and one day they're going to be 20," she said. "If a man did this to one of them, I wouldn't let him get away with it"—but rather of fear.

After plaintiff had answered interrogatories and submitted to deposition [7] and had

---

6. The record contains an affidavit by Boden stating that Ms. Wade had said

> that the whole problem with the Mayor was much worse than this single incident; that it involved several or many sexual incidents including homosexual activity and minors or children.

The interview with Boden yielded nothing.

7. Cianci admitted that he invited Redick to his room on the evening of March 2, 1966, and that she remained there for several hours, but denied all the pejorative elements of her story— administration of a drugged drink, threats of any kind, taking her to bed, or the conduct of sexual intercourse. He admitted having had intercourse in the room with other women,

initiated (but not completed) discovery on the issue of malice, defendants moved for an order dismissing the complaint under F.R.Civ.P. 12(b) and/or 56, and to stay discovery pending decision of the motion, on the grounds that:

   a.  as a matter of law, the allegedly libelous article is not actionable because plaintiff cannot prove at trial as is his burden that the facts set forth therein are false and defamatory because they have been admitted by plaintiff to be true and/or as to those few remaining facts which have not been specifically admitted, these are protected as the neutral reportage of facts from an independent source clearly identified as such; and

   b.  to the extent that the article infers, implies and/or expresses the opinion that plaintiff was guilty of the rape as charged by the alleged victim, such inference, implication and/or expression of opinion is constitutionally protected as a matter of law because all of the facts upon which such opinion is based are fully set forth in the article and also because the article does not state or imply that the defendants are privy to other facts not known to the general reader.[8]

The district court granted the motion in an opinion. This began by saying that the article was not defamatory since it "carefully refrains from stating that Cianci was indicted, officially charged, or guilty of the crime of rape as claimed by Redick. Nor does the article ever state that Cianci paid Redick $3,000 as part of an agreement to drop criminal charges". The court disparaged the defamatory effect of what would seem to be statements of fact as "slender indeed". However, what the court found decisive was "not the mere absence of a defamatory connotation in the article" but that "to whatever extent the article implies that Cianci was guilty of rape or improper

payoffs, such implications are constitutionally protected as expressions of opinion." The court was therefore not obliged to give specific consideration to the alternative defense of neutral reportage.

## DISCUSSION

Plaintiff freely concedes that his case is subject to the principles laid down in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). As a public official and a candidate for public office, see *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971), he can ultimately prevail only if he proves with "convincing clarity" that a defamatory statement "was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. We accept also that "as a matter of constitutional law . . . a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office, for purposes of application of the 'knowing falsehood or reckless disregard' rule of *New York Times Co. v. Sullivan*," *Monitor Patriot Co. v. Roy, supra*, 401 U.S. at 277, 91 S.Ct. at 628. We agree further that, whatever may be the situation at common law, see 1 Harper & James, The Law of Torts § 5.20 (1956); Eldredge, The Law of Defamation, ch. 13 (1978), a plaintiff within the ambit of *Sullivan* has, at least as a practical matter, the burden of proving falsity, since he must in any event establish that defendant published with knowledge of falsity or reckless disregard of the truth. See *Herbert v. Lando*, 441 U.S. 153, 159, 170, 175–76, 99 S.Ct. 1635, 1640, 1646, 1648–1650, 60 L.Ed.2d 115 (1979); see also K. Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report*, 54 N.Y.U.L.Rev. 469, 475 & n.23 (1979) [hereafter Sowle]. Although forced

---

possibly including an instance the previous night. His version with respect to the payment was as stated in note 4 *supra*.

**8.** The affidavit of defendants' counsel supporting their motion to dismiss or for summary

judgment made clear that the motion "was not based upon a claim that the defendants had not published the relevant article with actual malice, that is, with knowledge of falsity or with reckless disregard of the truth."

to bear these burdens, plaintiff complains at having been cut off from an opportunity to demonstrate that he can carry them.

I. *The article was reasonably susceptible of a defamatory connotation.*

The initial question is whether the article is "reasonably susceptible of a defamatory connotation," *James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976), so as to warrant its submission to a jury to determine if in fact the defamatory connotation was conveyed. Restatement, Second, Torts, § 614. The allegedly defamatory passages must be considered in the context of the entire article and the words taken as they are commonly understood. *Id.* § 563. The article was capable of bearing a defamatory meaning for two reasons: it contained explicit statements and fair implications *by the writer* which could be considered defamatory, and it also republished defamatory statements made by others, for which a defendant, unless protected by a privilege, is as liable as if he had made the statements himself.

Our summary of the article has revealed many instances where defendants could be found to have made charges of criminal conduct on their own responsibility. We start with the words of the headline:

**BUDDY
WE HARDLY KNEW YA**

A jury, considering this in light of the article as a whole, could surely conclude that New Times was saying that Mayor Cianci, instead of being the man of character he represented himself to be, was in fact a rapist and an obstructor of justice—not simply a person who had been accused of being such.[9] The statement in the inner headline about the lie detector test was clearly a statement of fact, although perhaps protected by privilege, as we shall see. The statement in the concluding portion of the article that "[f]or the nominal sum of $3,000, Cianci had managed to buy his way

out of a possible felony charge" was a direct statement of fact by the New Times, not just the repetition of a statement by another. Later the article says that "Redick hasn't tried to capitalize on her experience . . . ." The "experience" was being the victim of rape at gunpoint, not of having accused Cianci of it.

Beyond this the organization of the section of the article relating the circumstances of the decision not to prosecute Cianci and the $3,000 payment is also reasonably susceptible of a defamatory connotation. According to the complaint and evidence developed by the plaintiff, the defendants knew that the decision not to prosecute Cianci was made prior to and independent of any settlement between Cianci and Redick. Yet the organization of the article, for which the defendants alone are responsible, strongly implies that the payment was prior to and was the primary reason for the decision not to prosecute. The section begins by surveying the items of evidence in the police file, and moves on to quote Lieutenant Block as saying "When you think you have enough, you send it up to the D.A. Then you hope for justice." This clearly refers to a possible criminal prosecution. The article then immediately moves to discuss the $3,000 settlement, never suggesting that it was made *after* the withdrawal of the criminal complaint and *after* the decision not to prosecute had been reached. Then the article returns to discuss the decision not to prosecute Cianci *criminally.* The clear implication, or at least one which a jury could find, was that the $3,000 payment was made prior to the withdrawal of the complaint and the decision not to prosecute and, particularly when read in connection with the rest of the article, that it was a payoff designed to affect these decisions.

The second point is even plainer. A federal court has recently referred to the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the origi-

9. The sarcastic comparison with the book by O'Donnell and Powers with the similar title

could be found to have reinforced the defamatory implication.

nal publisher, and even though he expressly disavows the truth of the statement." *Hoover v. Peerless Publications, Inc.*, 461 F.Supp. 1206, 1209 (E.D.Pa.1978). This rule has been widely recognized. See, e. g., Restatement, Second, Torts § 578 (1977) ("one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it"); 1 Harper & James, *supra*, § 5.20 at 417; Prosser, Torts § 113 at 768 (4th ed. 1971). A good example of the application of this rule is *Olinger v. American Savings and Loan Assoc.*, 409 F.2d 142, 144 (D.C. Cir. 1969). Defendant had sent a letter to plaintiff Olinger's military superiors containing the statements "Mrs. Olinger reports that Col. Olinger is unwilling to permit her to sell the property and he will not keep the payments current on the first and second trust." As the court noted, this statement "was 'true' only because it was prefaced by 'Mrs. Olinger reports that . . .'" *Id.* at 144. Stating that "[t]he law affords no protection to those who couch their libel in the form of reports or repetition" and that "the repeater cannot defend on the ground of truth simply by proving that the source named did, in fact, utter the statement," the court reversed a grant of summary judgment for the defendant. The republication rule applies to the press, as it does to others, although the press may deprive particular benefit from certain privileges discussed below. See *Dixson v. Newsweek, Inc.*, 562 F.2d 626, 630–31 (10 Cir. 1977); *Cepeda v. Cowles Magazines and Broadcasting, Inc.*, 328 F.2d 869, 871 (9 Cir.) (dictum), *cert. denied*, 379 U.S. 844, 85 S.Ct. 51, 13 L.Ed.2d 50 (1964); *Pittsburgh Courier Pub. Co., Inc. v. Lubore*, 200 F.2d 355 (D.C. Cir. 1952); *Tilton v. Cowles Publishing Co.*, 76 Wash.2d 707, 459 P.2d 8, 16 (1969), *cert. denied*, 399 U.S. 927, 90 S.Ct. 2238, 26 L.Ed.2d 792 (1970); *Lancour v. Herald & Globe Ass'n*, 111 Vt. 371, 17 A.2d 253, 256–57 (1941). Cf. *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). Any different rule would permit the expansion of a defamatory private statement, ac-

tionable but without serious consequences, into an article reaching thousands of readers, without liability on the part of the republisher. See Eldredge, *supra*, § 44 at 233; *Venn v. Tennessean Newspapers, Inc.*, 201 F.Supp. 47, 56–57 (M.D.Tenn.1962), *aff'd mem.* 313 F.2d 639 (6 Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963); *Metcalf v. Times Pub. Co.*, 20 R.I. 674, 40 A. 864, 865 (1898) ("If a man has not the right to go around [and] tell of charges made by one against another, much less should a newspaper have the right to spread it broadcast and in enduring form.") The New Times article is replete with defamatory statements of fact repeated from others—Redick's detailed description of the bedroom scene, the statement attributed to the State Crime Lab expert that the polygraph report "showed this to be one of the most clear cut cases of rape he had ever processed . . . ", Redick's statement that she had dropped the charges in return for a $3,000 payment, and so on.

II. *The article is not protected as a statement of opinion.*

Despite this the judgment should stand if the district court was right in holding that the article was protected as an expression of opinion. In support of this conclusion the judge quoted a passage from Justice Powell's opinion for the Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–3007, 41 L.Ed.2d 789 (1974), which has become the opening salvo in all arguments for protection from defamation actions on the ground of opinion, even though the case did not remotely concern the question:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

Justice Powell's very next sentence, however, was that "there is no constitutional value in false statements of fact." The alleged libels in *Gertz*, which were deemed sufficiently "factual" to support an action for defamation, included an "implication

that petitioner had a criminal record" and charges that he was a "Leninist" or "Communist-fronter". *Id.* at 326, 94 S.Ct. at 3000. The sort of idea which can never be false was illustrated by reference to Thomas Jefferson's Inaugural Address, where the President argued for freedom for those "who would wish to dissolve this Union or change its republican form." *Id.* at 340 n.8, 94 S.Ct. at 3007 n.8.[10] A statement that Cianci raped Redick at gunpoint twelve years ago and then paid her in an effort to obstruct justice falls within the Court's explication of false statements of fact rather than its illustrations of false ideas where public debate is the best solvent.

The other Supreme Court cases cited as creating a constitutional exception for statements of opinion, *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), and *Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), are equally inapplicable to this case. In *Greenbelt* a newspaper was sued for republishing a speaker's comment at a city council meeting that plaintiff was "blackmailing" the city in connection with pending negotiations. Justice Stewart wrote for the Court that no libel had been committed because no one who read the account would have considered that the plaintiff was being charged with the crime of blackmail. The word was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." 398 U.S. at 14, 90 S.Ct. at 1542. The clear implication is that if an accusation of actual criminal wrongdoing had been conveyed, e. g., a statement that Bresler had threatened a councilman with

exposure of an extramarital episode unless he voted Bresler's way, it would have been held actionable, unless within a privilege of fair reportage of public proceedings discussed below. See the state court opinion, 253 Md. 324, 252 A.2d 755, 769 (1969).

In *Letter Carriers v. Austin, supra,* the Court relied on *Greenbelt* in holding that no one could reasonably understand publication of a well-known definition of a "scab", attributed to Jack London, as a "traitor to his God, his country, his family and his class", as charging the crime of treason. The words were protected because defendants were using them "in a loose, figurative sense . . . merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members to those who refuse to join." 418 U.S. at 284–86, 94 S.Ct. at 2782–83.[11]

This court's first relevant post-*Gertz* discussion of the distinction between statements of fact and of opinion was in *Buckley v. Littell*, 539 F.2d 882 (1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). The court there examined three alleged libels which the district court had found to have been perpetrated on William F. Buckley, Jr., admittedly a "public figure". The first was that Buckley was a fellow traveler of the fascists, as Buckley interpreted the term, or a fellow traveler of the radical right or the right wing. This court held that the use of such expressions "cannot be regarded as having been proved to be statements of fact, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate, an imprecision which is simply echoed in the book." *Id.* at 893. The second asserted libel was what

---

**10.** Mr. Justice Powell's reference to "the competition of other ideas" doubtless stemmed, consciously or subconsciously, from Mr. Justice Holmes' eloquent observation in *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (dissenting opinion) "that the best test of truth is the power of the thought to get itself accepted in the competition of the market." This origin also points strongly to the view that the "opinions" held to be constitutionally protected were the sort of thing that could be corrected by discussion.

**11.** Justice Powell dissented in *Letter Carriers*, decided the same day as *Gertz*. He argued that while derogatory opinions about "scabs" in general were protected, defendants had "specifically impugned" the character of plaintiff and were therefore subject to suit. 418 U.S. at 296–97, 94 S.Ct. at 2787. In light of this it can hardly be thought that his language for the Court in *Gertz, supra,* was meant to extend protection to an expressed or implied "opinion" such as that Cianci raped Redick or obstructed justice.

the district court had characterized as accusing Buckley of "deliberately acting as a deceiver in the purveying of fascist material", 394 F.Supp. 918, at 939, and of printing news items and interpretations picked up from openly fascist journals. The court reversed the holding below on this alleged libel as well, reasoning as to the first accusation that it rested on one interpretation of the accused book when another could be supported as readily, and as to the second accusation that the issue of what constituted "openly fascist journals" was as much a matter of debate as what constituted "fascism" itself.

In sharp contrast to these rulings with regard to "loosely definable, variously interpretable statements of opinion . . . made inextricably in the contest of political, social, or philosophical debate", id. at 895, was the court's treatment of the statement:

> Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do.

This was considered to be a defamatory assertion of fact namely, that Buckley had made false and libelous statements. After repeating the contrast drawn in Gertz between expressions of "pure opinion" and "false statements of fact", the court held the statement was actionable because "the clear meaning to be inferred was that he considered Buckley to be a libeler like Pegler." Id. at 896 (emphasis supplied). Since surely this was a statement of Littell's opinion, our decision must mean that when an "opinion" is something more than a generally derogatory remark but is laden with factual content, such as charging the commission of serious crimes, the First Amendment confers no absolute immunity, as distinguished from the qualified protection accorded by Sullivan in the case of public figures. And the court did not rest its decision at all on the basis that Littell implied he had reasons for believing Buckley to have been a libeller and defamer other than those disclosed in his articles.

No departure from this ruling was made by *Hotchner v. Castillo-Puche*, 551 F.2d 910 (2 Cir. 1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). The uncomplimentary references to Hotchner there at issue, such as that of being a "toady" and a "hypocrite", were of a most general and imprecise sort, see *id.* at 912. It was in this context that the court said, citing *Gertz* and *Buckley, id.* at 913: "A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be."

The highest courts of our two largest states have reached conclusions in accord with this court's analysis in *Buckley*. In *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977), plaintiff, a state court judge, charged defendants with libel in writing and publishing a book which charged the judge with being corrupt and incompetent and advocated his removal from office. The court ruled that the charge of incompetence and the advocacy of the judge's removal were protected as statements of opinion, but the charge of corruption was not:

> Accusations of criminal activity, *even in the form of opinion*, are not constitutionally protected. . . . While inquiry into motivation is within the scope of absolute privilege, outright charges of illegal conduct, if false, are protected solely by the actual malice test. As noted by the Supreme Court of California, there is a critical distinction between opinions which attribute improper motives to a public officer and accusations, *in whatever form*, that an individual has committed a crime or is personally dishonest. No First Amendment protection enfolds false charges of criminal behavior. *Gregory v. McDonnell Douglas Corp.* [17 Cal.3d 596, 604, 131 Cal.Rptr. 641, 646, 552 P.2d 425 (1976)]. 42 N.Y.2d at 382, 397 N.Y.S.2d at 951, 366 N.E.2d at 1307 (emphasis supplied).

Almost any charge of crime, unless made by an observer and sometimes even by him, cf. *United States v. Panico,* 308 F.2d 125, 128–30 (2 Cir. 1962) (dissenting opinion), vacated, 375 U.S. 29, 84 S.Ct. 19, 11 L.Ed.2d 1 (1963), is by necessity a statement of opinion. It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words "I think".[12]

■ The principle of the *Greenbelt-Letter Carriers-Gertz* trilogy, of our own *Buckley* decision, and of the New York Court of Appeals decision in *Rinaldi* is (1) that a pejorative statement of opinion concerning a public figure generally is constitutionally protected, quite apart from *Sullivan,* no matter how vigorously expressed; (2) that this principle applies even when the statement includes a term which could refer to criminal conduct if the term could not reasonably be so understood in context; but (3) that the principle does not cover a charge which could reasonably be understood as imputing specific criminal or other wrongful acts.

■ It is clear from the foregoing that even if the article were to be read as only expressing the "opinion" that Cianci committed the crimes of rape and obstruction of justice, it is not absolutely protected as distinguished from the protection afforded by *Sullivan.* The charges of rape and obstruction of justice were not employed in a "loose, figurative sense" or as "rhetorical hyperbole". A jury could find that the effect of the article was not simply to convey the idea that Cianci was a bad man unworthy of the confidence of the voters of Providence but rather to produce a specific image of depraved conduct—committing rape with the aid of trickery, drugs and threats of death or serious injury, and the scuttling of a well-founded criminal charge by buying off the victim. Such serious charges have not yet become "undefined slogans that are part of the conventional give-and-take in our economic and political controversies." *Cafeteria Union v. Angelos,* 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943). To call such charges merely an expression of "opinion" would be to indulge in Humpty-Dumpty's use of language. We see not the slightest indication that the Supreme Court or this court ever intended anything of this sort and much to demonstrate the contrary.

Defendants also argue that any implied opinion conveyed by the article is protected because it set forth the facts which, in their view at least, supported this opinion. Restatement, Second, Torts § 566 states:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

As acknowledged by the reporter, § 566 is the result of combining the limited constitutional protection of opinions and ideas surveyed above and the common law privilege of fair comment. See Wade, *The Communicative Torts and the First Amendment,* 48 Miss.L.J. 671, 694–95 (1977).[13] Our analysis has shown that pre-Restatement Supreme Court decisions do not support a definition of "opinion" broad enough to cover this case, and that our post-Restatement decision in *Buckley,* that of the New York Court of Appeals in *Rinaldi,* and the dictum

---

**12.** We find nothing in *Orr v. Argus Press Co.,* 586 F.2d 1108 (6 Cir. 1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979), relied on by the district court, that would support its conclusion. The question in that case was whether an otherwise accurate report of an indictment for violations of a Michigan securities statute was actionable because the report characterized the indictment as charging fraud and swindling. Although the court held that the use of these words constituted only a protected opinion as to the meaning of the indictments, nothing suggests that, absent the indict-

ment, the court would have bestowed immunity on charges that plaintiff had engaged in fraud or swindling. In any event the *Orr* court found that the report's characterizations were factually true, see *id.* at 1112–13.

**13.** The comments to § 566 quote *Gertz,* and illustrations 1 and 2 are drawn from *Greenbelt* and *Letter Carriers.* Since no sources are cited for the other illustrations, they give no support to the text, although the results reached may well be correct.

of the California Supreme Court in *Gregory* are to the effect that opinions may support a defamation action when they convey false representations of defamatory fact, even though there is no implication that the writer is relying on facts not disclosed, see also *Greenbelt, supra*, 398 U.S. at 13, 90 S.Ct. at 1541; *Letter Carriers, supra*, 418 U.S. at 286, 94 S.Ct. at 2782; *Hotchner, supra*, 551 F.2d at 913. While the disclosure of factual background may indicate whether a particular word constituted a direct charge of crime or a looser protected opinion, as with "blackmail" in *Greenbelt* or "traitor" in *Letter Carriers*, nothing in those cases nor in our own *Buckley* and *Hotchner* decisions suggests that such disclosure would protect as opinion a direct accusation of criminal misconduct.[14]

Our holding that the article was not within the constitutional protection for false

ideas requires us to consider whether it may nevertheless have been protected by the common law privilege of fair comment. While the Court said in *Sullivan*, 376 U.S. at 292 n.30, 84 S.Ct. at 732 n.30:

> Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. Both defenses are of course defeasible if the public official proves actual malice, as was not done here.

defendants are not aided by this at the present stage of the case since plaintiff has not yet had his opportunity to prove actual malice. The question thus is whether defendants made a showing of being within the common law privilege sufficient for the

---

**14.** A few other cases deserve comment. In *National Association of Government Employees, Inc. v. Central Broadcasting Corp.*, —— Mass. ——, 396 N.E.2d 996 (1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980), the plaintiff union had negotiated a contract for the town policemen, which was approved by two selectmen but opposed by the third, one Abraham Goodman. The executive director of the union had warned Goodman that he was "prohibited from speaking against the contract, but must support it", and had also asked the F.C.C. to investigate the radio station's opposition to the contract. In the course of a show having the familiar format of members of the audience conversing with the announcer, Goodman voiced his support of the station's exercise of its right of free speech, for which the announcer thanked him, and went on to say that "if we do not get together and stop the inroad of communism, something will happen", to which the announcer agreed. After some further discussion about the threat that Goodman would not be allowed to speak at the town meeting although the union attorney would, Goodman reiterated his offer to "help the station towards fighting the inroads of communism which in this particular case is the union." After a call criticizing Goodman for the charge of communism, the announcer explained that all Goodman was really complaining about was the union's attempt to stifle free speech. The Supreme Judicial Court reversed a denial of defendant's motion for summary judgment on three independent grounds: (1) that the statements were of opinion on disclosed or assumed facts, citing § 566 of the Restatement; (2) that the charge of communism was "too amorphous a characterization to

be actionable"; and (3) that there was no genuine issue as to knowledge of falsity or reckless disregard within *Sullivan*. Clearly the case was the very archetype of what Mr. Justice Powell meant in *Gertz*; indeed, it was an easier case for the defendant than *Greenbelt* or *Letter Carriers*. The issue was not simply of the type that could be decided in a town meeting; it was about to be so debated. Nothing in the opinion remotely implies that the court would have reached the same result if, e. g., Goodman had charged that the union executive had bribed the two other selectmen.

Another opinion which cited § 566 with approval, but has no bearing on the instant case, is *Mashburn v. Collins*, 355 So.2d 879 (La. 1977), which involved a detailed adverse newspaper review of the cuisine at a newly opened restaurant. This again was a matter of opinion which would ultimately be resolved by the taste buds. If the review had claimed that the restaurant had used condemned food or was in violation of sanitation laws, the result could and, in our view, should have been different.

A decision which, although not citing § 566 of the Restatement, would be inconsistent with its letter as construed by the district court is *Catalano v. Pechous*, 69 Ill.App.3d 797, 25 Ill. Dec. 838, 387 N.E.2d 714 (App. Court of Illinois, First District, Second Division, 1978, supplemental decision on rehearing, 1979), holding a statement that "240 pieces of silver changed hands—30 for each alderman" in connection with the award of a city contract was not within the constitutional exception for statements of opinion. The court relied on our decision in *Buckley, supra*, 539 F.2d at 896.

grant of summary judgment. We have, no reason to believe that save for the newly created exception for "pure opinion", which we have held to be inapplicable to the facts of this case, and the application of *Sullivan*, which is as yet premature, the present law on fair comment differs from that of older times. If § 566 of the Restatement, Second means to say so, we would be unable to agree with it.

██ The common law privilege of fair comment applied only if the disclosed facts were true or privileged. Restatement, First, Torts § 606; Gatley, Libel and Slander 325–31 (6th ed. 1967). Here plaintiff alleges that the article is replete with misstatements of fact. The issue of truth is surely not ripe for summary judgment, and we hold below, in Part III of this opinion, that not all the reported facts were protected by a constitutional privilege of neutral reportage or the common law privilege of fair report. The privilege of fair comment was also lost if the comments were made with malice, in the common law sense of spite or ill-will. Restatement, First, Torts § 606, comment d. Although such ill-will is not directly implicated on the constitutional question under *Sullivan*, see *Rosenbloom v. Metromedia*, 403 U.S. 29, 52 n.18, 91 S.Ct. 1811, 1824 n.18, 29 L.Ed.2d 296 (1971) (plurality opinion), it would remain pertinent to this distinct common law issue, and plaintiff's complaint alleges it more than adequately.

Moreover it is unlikely that an expression in the form of "I think Cianci raped Redick at gunpoint" would be considered a "comment" so as to come within the fair comment privilege. It is far from the usual sort of evaluative judgment with which the privilege has traditionally been concerned. Contrast Restatement, First, Torts § 607, illustration 1 (police chief unfit for office); illustration 2 (magistrate criticized for fixing high bail); illustration 3 (quality of work by contractor on public streets criticized); illustration 4 (European dictator criticized for acts which impair world peace). The problems with an extension of the privilege of fair comment to include specific allegations of fact were articulated long ago and have not lost their validity:

Were such an objection to be sustained to an action for slanderous words, it would be easy for one who designed to injure the character of another to effect his malicious purpose without incurring any responsibility. By circulating the slander, clothed in expressions of opinion or belief, he might destroy the fairest reputation with impunity. But the law will not permit an injury to character to be without remedy by such an artifice as this. Whatever may be the mode of expression used, if an assertion of guilt is implied or intended, the words will be actionable. *Logan v. Steele*, 1 Bibb. 593, 595 (Ky.1809).

In *Professional & Business Men's Life Ins. Co. v. Bankers Life Co.*, 163 F.Supp. 274 (D.Mont.1958), the court sustained an action based on a notice which warned those approached by insurance salesmen making seven specified representations to contact the state insurance commissioner. The notice implied the opinion of dishonest business practices, and "a suspicion, belief, or opinion is as effectively a libel as though the charge were positively made," even though the basis for the opinion, the seven representations, was disclosed. *Id.* at 287 (quoting *Woolston v. Montana Free Press*, 90 Mont. 299, 2 P.2d 1020, 1022 (1931)). In *Venn v. Tennessean Newspapers Inc.*, supra, 201 F.Supp. at 56, defendant newspaper published the comments of others linking plaintiff with underworld figures. The defense of fair comment was not allowed. "The libellous imputations and statements . . . are unadulterated imputations and statement of fact and by no stretch of the imagination could they be classified as comments or expressions of views or opinions . . . ." As indicated by *Buckley, Rinaldi*, and *Gregory, supra*, the more recent cases are in accord with the view that charges of specific criminal misconduct are not protected as "opinions". See also P. Keeton, *Defamation and Freedom of the Press*, 54 Tex.L.Rev. 1221, 1254 (1976) (arguing that when fault with respect to the truth or falsity of the defamatory matter

published is a prerequisite to recovery "[a]ny charge of specific misconduct or defamatory fact should be treated as a statement of fact regardless of whether the publisher conveys his deductive opinion alone or with the information to support it.").

■ Further, the common law privilege of fair comment does not here apply because the disclosed facts and any implied opinion are inextricably intertwined in the accused article. The reader is not presented with facts and a separate inference therefrom; rather the opinion is conveyed as part and parcel of the factual disclosures. See Gatley, *supra*, at 324; *Luster v. Retail Credit Co.*, 575 F.2d 609, 616–17 (8 Cir. 1978) (credit report detailing certain facts could be read as charging the plaintiff with arson and is actionable). In such a case it is meaningless to say that the opinion is protected, when the facts are not.

III. *The article is not protected by a constitutional privilege of neutral reportage or the common law privilege of fair report.*

We are thus obliged to consider the second ground of the defendants' motion, see text accompanying note 8 *supra*, which the district court did not reach, namely, a claim that the article is protected by a different constitutional privilege, generally called the privilege of neutral reportage.

The common law has long recognized a privilege of fair report of public court trials, see *Curry v. Walter*, 126 Eng.Rep. 1046 (C.P. 1796). In the United States this privilege was extended to accounts of public legislative, executive and administrative proceedings, see Sowle at 471–73 and accompanying notes, the rationale being that since any member of the public could have attended the proceedings or read the reports, the media were simply acting as its agent. How far the privilege extended beyond public proceedings and reports was unclear. There was, for example, a differ-

ence of opinion how far the privilege covered police investigations and reports, see Eldredge, *supra*, § 79 at 434–36, Sowle at 473 & n.12, and the general rule was that the privilege did not include non-public judicial proceedings, Eldredge, *supra*, at 436–38, or a complaint on which no official action had been taken, see Restatement, Second, Torts § 611, comment e, at 300.

While the Supreme Court has not yet addressed the question of the existence of a constitutional privilege of neutral reportage, going beyond that generally recognized at common law,[15] this circuit is on record that the media enjoy such a privilege with respect to public officials or figures. That step was taken in *Edwards v. National Audubon Society*, 556 F.2d 113 (2 Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). A brief summary of the facts is needed. A violent controversy existed between manufacturers and sellers of DDT on the one hand, and naturalists and environmentalists on the other. One point in controversy, strenuously urged by the National Audubon Society, was the adverse effect of DDT on bird life. The proponents of DDT answered these charges by citing the increasing number of birds recorded in the Society's own annual Christmas Bird Count. The Society responded, *inter alia*, that the increase showed not more birds but more and better bird-watchers. The debate led to the publication in the Society's April 1972 issue of American Birds of a foreword by the editor, Robert S. Arbib, Jr., which, after pointing out what he considered this misuse of the Society's data, contained a sentence stating:

> Any time you hear a "scientist" say the opposite [namely, that the counts showed more birds], you are in the presence of someone who is being paid to lie, or is parroting something he knows little about.

Regarding this publication as in itself a newsworthy development in the course of

---

**15.** The Sowle article, *supra*, at 501–08, demonstrates that when *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), is closely analyzed, it does not mandate a constitution-

al report privilege when plaintiff is a public official or figure, as asserted in Prosser, *supra*, at 832.

the DDT debate, *New York Times* reporter John Devlin telephoned Arbib to obtain the names of those whom the Society considered to be the paid liars. After consulting Roland Clement, the Society's Staff Biologist and Vice President, Arbib supplied Devlin with a list of five eminent names, although there was a dispute whether Arbib also furnished a qualification demanded by Clement that the Society had no evidence of anyone being a paid liar as distinguished from a consistent misinterpreter of the information in the Society's statistics. Devlin sought to secure comments from the five and succeeded in reaching three, who vigorously denied the charges.

"Having thus in good faith elicited both sides of the story to the best of his ability," *id.* at 118, Devlin then published a story in the *New York Times* of August 14, 1972. This was a fair account of what Arbib had written in the Society's report, the names that Arbib had given and a summary of the answers Devlin had obtained.[16] Clement reacted negatively to the story. He wrote a letter to the *Times*, over Arbib's signature, seeking to tone down Arbib's charges by saying, "Nor do we like to call people liars, but those who have most consistently misused our data", naming the five, "certainly have had time to learn from our patient explanations of their misinterpretations of our data over the several years of the DDT controversy." The *Times* did not print the letter.

The jury returned a verdict against the *Times* and Clement but exonerated Arbib. In an opinion by Chief Judge Kaufman this court reversed the judgment against the *Times* on the basis of a constitutional report privilege and also on the ground that the evidence adduced at trial was insufficient to demonstrate "actual malice", and against Clement on the ground that he had not been a party to the charge of venality. The decision in regard to the constitutional report privilege has been well received by the commentators, see Comment, Constitutional Privilege to Republish Defamation, 77 Co-

lum.L.Rev. 1266 (1977); Sowle at 527–28, although rejected by the Third Circuit in *Dickey v. CBS, Inc.*, 583 F.2d 1221 (3 Cir. 1978).

As would be natural in a case establishing a new principle, the *Edwards* opinion did not attempt precise definition of its contours. However, it did contain important suggestions that the privilege was limited in scope and required careful examination of the facts in each case. Examples are the statements that "when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of these charges, regardless of the reporter's private views regarding their validity"; that "[w]hat is newsworthy about these accusations is that they were made"; that "[t]he public interest in being fully informed about such controversies that rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them"; that while "we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made . . . [i]t is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage" but rather "assumes responsibility for the underlying accusations"; that the *Times* had "published the maligned scientists' outraged reactions in the same article that contained the Society's attack"; that the article was "the exemplar of fair and dispassionate reporting of an unfortunate but newsworthy contretemps"; and that "[w]e believe that the *New York Times* cannot, consistently with the First Amendment, be afflicted with a libel judgment for the accurate reporting of newsworthy accusations made by a respon-

---

**16.** The story included a sentence that "[n]ot all of the men could be reached for comment but those who could ridiculed the accusations as 'emotional,' 'hysterical,' and unfounded, and Dr. Spencer said they were 'almost libellous.'" *Id.* at 118.

sible and well-noted organization like the National Audubon Society." 556 F.2d at 120–22.[17]

■ The New Times article fulfills almost none of the conditions laid down in *Edwards*. While, as indicated above, the precise bounds of the privilege remain to be delineated, it is enough for decision in this case that a jury could well find that the New Times did not simply report the charges but espoused or concurred in them; indeed, despite the ingenious construction of the article, more naivete than ought to be demanded even of judges is needed to consider the article as doing anything else. In addition to the instances cited in the second paragraph of Part I of this opinion, the New Times made no mention of Cianci's claim of innocence of the charge of rape, see note 7 *supra*, save in the backhanded form of quoting Eisenberg's remark that he had called the charge a "shakedown". It said nothing of Cianci's position, see note 4 *supra*, that the $3,000 was paid in settlement of Redick's contemplated civil suit rather than to induce her to withdraw the criminal charge. Indeed the New Times did not obtain Cianci's version of the facts, although it allowed a lawyer for him to meet with some of its representatives and submit certain papers to them.[18] The article made no mention of the statement by Redick's own attorney to the author that "a crime did not occur. That's my—that's our

position." The article conveys the impression that Boyle decided not to prosecute largely because Redick dropped the charges and polygraph results were inadmissible, but in the interview with the author Boyle stated "I have no idea in fact as to what the lawyers or the parties themselves decided. That's immaterial to me. What is material to me is the analysis of evidence from the standpoint of proof beyond a reasonable doubt." What the article described as the "hard-nosed techniques" employed by the first reporters who attempted to revive the story were described by Redick herself as "pressuring me and threatening me and harassing me and trying to get me to talk . . . that if I didn't tell them that they would have the story printed with my name, identify my family and take pictures of my home and my children." Plaintiff cites numerous other examples which would undermine a claim of "fair" and "neutral" reporting, such as the failure to reveal facts undermining the credibility of such critical figures as Eisenberg and Redick.

The need for the careful limitation of a constitutional privilege for fair reportage is demonstrated by the breadth of that defense, which confers immunity even for publishing statements believed to be untrue. Absent the qualifications set forth by Chief Judge Kaufman in *Edwards*, all elements of the media would have absolute immunity to espouse and concur in the most

---

**17.** Chief Judge Kaufman later stated in dictum in *Herbert v. Lando*, 568 F.2d 974, 980 (2 Cir. 1977), rev'd on other grounds, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) that "in *Edwards* . . . we held that a newspaper could not libel an individual when the reporter engaged in the neutral reportage of newsworthy material." This necessarily encapsulated statement plainly was not intended to supersede the fuller exposition in *Edwards*.

**18.** Professor Sowle, a strong advocate of a constitutional privilege for neutral reportage, including non-official statements, states at 539–40:

A special problem arises with the fairness requirement as it pertains to reports of non-governmental statements and proceedings. If a report privilege is to extend to statements made to the press on matters of legiti-

mate public concern, fairness requires that the publisher, to be protected, present a balanced report, not just of the statement itself, but of the debate on the controversy to which the statement is addressed. Thus, the report of a statement besmirching an individual—public or private—would fall within the privilege only if it is fair to the individual involved in the public issue, presenting his or her side of the story as well as the other. This requirement merely follows the common law fair report privilege, which, for example, allows the publisher to make an ongoing, balanced report of the day-to-day events at a public trial, but would not protect a partial report, which, for example, reported only the prosecution's evidence in a criminal case and omitted the defendant's.

unwarranted attacks, at least upon any public official or figure, based on episodes long in the past and made by persons known to be of scant reliability. And this, although without any such immunity, the media already enjoy the generous protection accorded by *New York Times Co. v. Sullivan* with respect to erroneous statements of fact or opinion. In *Edwards* Chief Judge Kaufman quoted Professor Emerson's statement:

> A member of a civilized society should have some measure of protection against unwarranted attack upon his honor, his dignity and his standing in the community, [Toward a General Theory of the First Amendment 69,]

but considered that it must yield to the compelling circumstances arguing for a constitutional privilege of fair reportage in that case. It should not be further eroded to the extent demanded by the defendants here.

There remains the point, not raised by defendants' motion or argued to us, that some portions of the article may be protected by the privilege of fair report as recognized at common law. Considering what law a New York court would apply, see *Klaxon Co. v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we predict that although the New Times' place of business was in New York, a New York court would apply the law of Rhode Island. See Restatement, Second, Conflict of Laws § 150(2) and comment e.

Unfortunately the cases, whether in Rhode Island or elsewhere, are not settled on how far defendants had a common law privilege to publish some or all of the statements made in 1966; clearly they had none with respect to the purely private statements made in 1977 or 1978. The Restatement would not protect publication of the material in the police file or Redick's original statement to the police, see Restatement, Second, Torts § 611, comment h. This is certainly the rule of the older cases, including one from Rhode Island. See *Met-*

*calf v. Times Pub. Co., supra*, 20 R.I. 674, 40 A. 864, 866 ("the right of a party to make charges gives no right to others to spread them"); *Jastrzembski v. Marxhausen*, 120 Mich. 677, 79 N.W. 935, 937 (1899) ("Reports made to police officers charging persons with crime are not privileged communications, and those who publish such reports do so at their peril."); *Lancour v. Herald & Globe Ass'n, supra*, 111 Vt. 371, 17 A.2d 253, 259 ("We do not regard a preliminary police investigation as a judicial proceeding or the publication of a statement made in the course thereof . . . as within the protection of a qualified privilege. Information of this nature given out by the police is not to be considered as a statement of facts developed on a judicial investigation or the statement of a fact resulting from a judicial investigation."). The *Metcalf* case was cited in *Pittsburgh Courier Pub. Co., Inc. v. Lubore, supra*, 200 F.2d at 356, for the proposition that "few if any courts would extend the privilege so far as to cover reports of charges made, without results, to a policeman or prosecutor." Some more recent decisions apparently have extended the privilege, although many of these are distinguishable on the ground that there had been official action in the form of an arrest. See, e. g., *Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406 (E.D.Pa. 1978); *Piracci v. Hearst Corp.*, 263 F.Supp. 511, 515 (D.Md.1966), aff'd 371 F.2d 1016 (4 Cir. 1967). Others may not be so distinguishable. See, e. g., *O'Neal v. Tribune Co.*, 176 So.2d 535, 547 (Fla.App.1965); *Stice v. Beacon Newspaper Corp., Inc.*, 185 Kan. 61, 340 P.2d 396, 400 (1959). Even if the common law would protect republication of the material in the police file and Redick's statement to the police, which we do not decide, this would still leave unprotected the republication of Redick's 1978 statements to the reporter, the entire matter of the obstruction of justice charge, and what a jury might find to be defendants' endorsements of the truth of Redick's claims. Since, as indicated, defendants did not raise the claim of the common law fair report

privilege in their motion in the district court or in their brief or argument on appeal, it would be inappropriate for us to rule finally on such a claim.

The judgment dismissing the complaint is therefore reversed and the cause remanded for further proceedings consistent with this opinion.

We stress the narrow character of our ruling, namely that the defendants are not immunized by a constitutional exception for statements of opinion, by the common law privilege of fair comment, or by the constitutional privilege of neutral reportage recognized in *Edwards*, and that we decline now to decide whether certain portions of the article may be protected by the fair report privilege recognized at common law. We repeat, as we said at the outset, that our ruling in no way relieves the plaintiff from the heavy burden imposed by *New York Times Co. v. Sullivan*, which indeed might even entitle defendants to prevail on a motion for summary judgment when the discovery in regard to "malice" has been completed. We hold only that the district court was not justified in lowering the boom on Mayor Cianci when it did.

### On Suggestion for Rehearing In Banc

A petition for rehearing containing a suggestion that the action be reheard in banc having been filed herein by counsel for the defendants-appellees and said suggestion having been transmitted to the judges of the court in regular active service and to the other judges on the panel that heard the appeal and a poll of the judges in regular active service having been taken on the request of such a judge, and there being no majority in favor thereof,

Upon consideration thereof, it is

Ordered that rehearing in banc be and it hereby is denied.

Noted that Judge Kaufman filed a separate concurrence to the said denial in which Judges Mansfield and Oakes, and Newman concurred.

Further noted that Chief Judge Feinberg took no part in the consideration of said petition.

IRVING R. KAUFMAN, Circuit Judge (concurring), with whom MANSFIELD, OAKES, and NEWMAN, Circuit Judges, concur:

I originally voted to grant en banc reconsideration in this case because of my belief that the panel's opinion might be construed to undermine the neutral reportage privilege enunciated in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). Apparently, my colleagues do not read the opinion here as inconsistent with *Edwards*. I am heartened by this reassurance that *Edwards* is still the law of this Circuit. Thus, although the panel does not always discuss *Edwards* in the terms I would have chosen, *Edwards* survives *Cianci* unscathed.

I note as well that this case is still in the pre-trial stage. The majority's opinion merely reverses the district court's grant of summary judgment in favor of the defendants and sends the case back for a trial. At the trial, I assume, all factual disputes will be weighed. New Times asserts it tried repeatedly to secure Cianci's version before publishing its story, and made other efforts to verify the charges levelled against him. These are proper areas for evidentiary exploration in the lower court in connection with the application of the *Edwards* neutral reportage privilege.